UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | | |
|---|---|---|
| BENIGNO GARCIA AGUILAR, | ) | No. CV 13-08307-VBK |
| Plaintiff, | ) ) | MEMORANDUM OPINION AND ORDER |
| v. | ) ) | (Social Security Case) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) ) | |

This matter is before the Court for review of the decision by the Commissioner of Social Security denying Plaintiff's application for disability benefits. Pursuant to 28 U.S.C. §636(c), the parties have consented that the case may be handled by the Magistrate Judge. The action arises under 42 U.S.C. §405(g), which authorizes the Court to enter judgment upon the pleadings and transcript of the Administrative Record ("AR") before the Commissioner. The parties have filed the Joint Stipulation ("JS"), and the Commissioner has filed the certified AR.

Plaintiff raises the following issues:

1.  Whether the Administrative Law Judge ("ALJ") properly

               assessed the examining physicians' opinions;

2. Whether the ALJ properly determined that Plaintiff could perform other work; and

3. Whether the ALJ provided clear and convincing reasons for rejecting Plaintiff's subjective testimony.

(JS at 4.)

This Memorandum Opinion will constitute the Court's findings of fact and conclusions of law. After reviewing the matter, the Court concludes that for the reasons set forth, the decision of the Commissioner must be reversed and the matter remanded.

**I**

**THE ALJ PROPERLY ASSESSED EXAMINING PHYSICIANS' OPINIONS**

**A.**  **Physical Impairment Evidence**.

In an unfavorable decision issued on September 27, 2012 (AR 23-33), the ALJ comprehensively summarized longitudinal examination and treatment records pertaining to Plaintiff's physical and mental impairments. As summarized in the decision, Plaintiff had surgical repair of a medial meniscus tear in December 2008. He then reported pain on a level of 3 out of 10, which increased with walking, and significantly increased with bending of the right knee, where he had undergone the surgery. The ALJ examined and summarized physical therapy progress notes from December 2008 to January 2009 which reflected what he characterized as "overall improvement," and indeed, the ALJ noted that Plaintiff was observed ambulating with improved gait, no longer using crutches, and his lower extremity strengthening exercises were well tolerated. The ALJ observed that by February 2009

there was continued improvement, although Plaintiff had an antalgic gait pattern. He was advised to continue with progression of strengthening. Treating source orthopedic progress notes of Dr. Harris recommended continuation of therapy with definite improvement, and as the ALJ observed, Plaintiff admitted increased weight bearing activities and only infrequent limping at the end of the day. He had improvement in his lumbar spine as his gait mechanics improved. He had a normal neurological exam for both lower extremities. He was advised that he should complete physical therapy and home exercises and continue with weight-bearing activities as tolerated. Plaintiff indicated he would consider Dr. Harris' suggestion for trigger point injections for the lumbar spine. By July 2009, Plaintiff continued to have progressive improvement in the right knee with increased weight-bearing activities. He was referred to a pain management specialist for consultation regarding epidural steroid injections which, by January 2010, had not been authorized by the insurance carrier. (AR 26, citing AR 285-288; 289-325; 330-359; and 434-458.)

In August 2010, at the request of the Department of Social Services, Plaintiff received an internal medicine evaluation ("Consultative Evaluation," or "CE") performed by Dr. Siciarz. (AR 485-490.) Although Plaintiff complained that he has back pain and some knee pain when he climbs stairs or with prolonged walking (AR 27, 486), the physical examination he received indicated no significant functional limitations. He had no tenderness in the back, a negative straight leg raising test, normal muscle strength, normal ambulation, and the mental status examination was grossly normal. (AR 47-48.) Consequently, Dr. Siciarz rendered an opinion that Plaintiff could perform work at a medium exertional level, stand and walk six hours,

3

and sit without restrictions. (AR 27, 489.)

Plaintiff notes that the ALJ failed to address work restrictions that were imposed by Plaintiff's initial treatment providers, Drs. Byer and Romero, who provided care to Plaintiff within weeks of his August 2008 injury to his back and knee. (AR 232-235, 237-239.) Because of a torn meniscus in his right knee, by mid-October 2008, Plaintiff's care was turned over to Dr. Harris, who in December 2008, performed arthroscopic surgery on Plaintiff's right knee, which the Court has noted above. (AR 229, 234, 308-325, 265-284, 308-325.)

The ALJ carefully reviewed Plaintiff's treatment records post-surgery, from December 2008 to January 2010. (AR 26.) As noted, despite some residual pain, Dr. Harris indicated that Plaintiff had definite improvement, with increased weight-bearing activities, a normal neurological examination, and pain reported as only intermittent. (AR 26, 289-290.)

Despite Plaintiff's reports of back pain beginning in March 2009, as the ALJ noted, Plaintiff's examinations by treating doctors indicated normal gait, and a good range of motion. (AR 340-354.) By January 2010, there are no further treatment records for Plaintiff's knee and back. (AR 26, 145-159, 435-437.)

Despite referencing Plaintiff's brief pre-surgery treatment by Drs. Byer and Romero (JS at 5-6), Plaintiff does not assert that the ALJ committed any cognizable error by failing to include the opinions and diagnoses of these physicians in determining whether a disability existed. Because these physicians treated Plaintiff for a brief period prior to his surgery, it would have been fruitless to assess error by the ALJ in failing to consider their opinions, especially since on a consistent longitudinal basis, after Plaintiff's knee surgery, he

4

experienced significant functional improvement. The fact that he had intermittent pain does not rise to the level of a disabling impairment.

What Plaintiff does complain about, however, is that the ALJ failed to discuss or provide any assessment of a form entitled "Lumbar Spine Residual Functional Capacity Questionnaire," filled out by Dr. Steven Nagelberg on August 10, 2011. (AR 617-620.) Dr. Nagelberg made functional assessments which, had they been accepted by the ALJ, would clearly have affected the Residual Functional Capacity ("RFC") which was ultimately assessed. But here, the Court agrees with the Commissioner's position that no error was committed by failing to provide any assessment or discussion of Dr. Nagelberg's conclusions. There are several reasons for this, which the Court will discuss.

First, Plaintiff's conclusion that Dr. Nagelberg acted as an examining physician in this case (see JS at 5) is suspect. The form itself indicates that all relevant treatment notes, radiologist's reports, laboratory and test results that have not been provided previously to the Social Security Administration should be attached. (AR 617.) Yet, there is nothing attached, and there are no notes indicating that Dr. Nagelberg actually examined Plaintiff. The Commissioner argues that the Court should apply harmless error analysis (see Strauss v. Commissioner of the Social Sec. Admin., 635 F.3d 1135, 1138 (9th Cir. 2011)). The Court agrees. First, even if Dr. Nagelberg actually examined Plaintiff, it was an extremely brief examination which, according to the Form itself, consumed at most 45 minutes. (AR 617.) Of equal or greater importance, however, is that Dr. Nagelberg's opinions are completely out of line with those of other examining physicians and treating physicians, whose conclusions

have been summarized in this Memorandum Opinion. Dr. Nagelberg rendered an opinion that Plaintiff had less than a sedentary exertional ability, that he could stand and walk only up to four hours in an eight-hour day, that he would need to have a sit/stand option, and that he could be absent from work two days per month. A year earlier, however, Dr. Siciarz actually did examine Plaintiff (AR 485-490), and despite Plaintiff's complaints of back pain and some knee pain when he climbed stairs or did prolonged walking, the physical examination shows no significant functional limitations. Dr. Siciarz rendered an opinion that Plaintiff could perform work at a medium exertional level, stand and walk for six hours, and sit without any restrictions. (AR 27, 489.) The ALJ gave Plaintiff some benefit, reducing his RFC to an ability to perform work at a light exertional level with occasional bending and stooping and no working around hazards. (AR 29.) The State Agency reviewing physician agreed. (AR 27, 497-501.) Moreover, the extreme functional restrictions assessed by Dr. Nagelberg are almost contradictory to the progress measured by Plaintiff's treating physician, Dr. Harris, for a significant period of time after the December 2008 knee surgery. Also, as this Court has noted, the record indicates that Plaintiff responded favorably to physical therapy during this period of time.

In 2011, somewhat suddenly, Plaintiff indicated to his medical provider at Clinicas Del Camino Real that he was not able to work and he requested Social Security disability forms to be filled out, based on allegations of constant pain which affected his daily activities and his ability to run, sit, stand or walk. (AR 599.) Despite this, on physical examination, Plaintiff demonstrated a normal gait, negative straight leg raising test, and a normal range of motion in his back.

(AR 601.) In June 2011, the examination revealed no musculoskeletal problems and a normal range of motion, with good muscle strength. (AR 592-593.) Again, these records completely contradict Dr. Nagelberg's apparent conclusions on a form which is not much more than a "check-the-box" form, which is entitled to little, if no credence.

For the above reasons, the Court must conclude that any failure by the ALJ to discuss Dr. Nagelberg's form conclusions is at most harmless error, as the result would not have been any different had the ALJ considered the outlier findings of Dr. Nagelberg.

**B.   Mental Impairment Evidence**.

The ALJ assessed that Plaintiff has depression as a severe impairment. (AR 25.) Nevertheless, Plaintiff asserts error in that the ALJ did not address mental functional limitations found by Dr. Criselda Abad-Santos, who performed a psychiatric CE on August 28, 2010 at the request of the Department of Social Services. (AR 491-496.) Dr. Abad-Santos rendered a diagnostic impression on Axis I of major depressive disorder, recurrent, moderate. Her functional assessment was for mild limitations, inability to understand, remember and carry out simple job instructions; marked limitations in ability to do detailed and complex instructions; marked limitation in ability to relate and interact with co-workers and the public; moderate limitations in ability to maintain concentration and attention, persistence and pace; marked limitations in ability to associate with day-to-day work activity, including attendance and safety; moderate limitations in ability to accept instructions from supervisors; and marked limitations in ability to maintain regular attendance in a work place and perform work activities on a consistent basis, and to

perform work activities without special or additional supervision. (AR 495.)

Further, Dr. Abad-Santos assessed that Plaintiff was currently unable to return to work and would definitely benefit from at least three months of psychiatric treatment and medications to stabilize his depressive symptoms and to prevent hospitalization. (<u>Id</u>.)

Plaintiff also received some treatment from Dr. Chang, a licensed clinical psychologist, who provided a "Final Comprehensive Psychological Report" in connection with Plaintiff's workers compensation case, on January 4, 2010. (AR 30, 423-433, 522-523.) Dr. Chang reported a mental status examination within normal limitations (AR 425), with no suicide ideations, delusions or loose thought processes (AR 425). He was attentive and cooperative during the examination and maintained excellent rapport; emotional expression was appropriate and reality testing was intact; he had good long term memory; good communication skills; was polite and casual; and presented with average intelligence, good insight and judgment. (AR 425-426.) Dr. Chang assessed moderate limitations in daily living, concentration, persistence and pace, and mild limitations in social functioning. (AR 428-430.)

The State Agency reviewing physician, Dr. Patterson, did not agree with the assessment rendered by Dr. Abad-Santos, and assessed mild limitations in most functional areas. (AR 28, 502-518.) Dr. Patterson reviewed Plaintiff's treatment records which indicated that he had the capability to seek out appropriate care for his physical conditions but was not receiving any treatment for depression. She also indicated that the conclusions rendered by Dr. Abad-Santos "lack any supporting objective evidence and seem extreme in a context in

8

which this claimant is not receiving any treatment, not even psychotropic meds typically prescribed for assistance w/pain management and commonly prescribed by orthopedic MDs or pain management specialists." (AR 518.)

The ALJ determined that Dr. Patterson's rationale was entitled to significant credibility because the record failed to document any current regular mental treatment, or consultation with an appropriate mental health specialist. (AR 30.)

An ALJ can reject the opinion of an examining physician in favor of that of a non-examining physician if based on specific and legitimate reasons supported by substantial evidence in the record. See Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).

Looking at the record as a whole, on a longitudinal basis, the Court cannot find error in the ALJ's assessment, because despite seeking care for his physical condition on a very assertive basis, Plaintiff did not do the same with regard to any mental impairment, and there is no indication that Plaintiff was unaware of his ability to obtain treatment, or could not afford treatment if it had been prescribed. Plaintiff was not given any psychotropic or other medications for his asserted severe mental condition. Nevertheless, the ALJ did assess depression as a severe impairment, and accommodated that finding by determining that Plaintiff had the capacity to only perform simple, routine tasks with occasional contact with the public and co-workers. (AR 29.) Essentially, as the ALJ noted, Plaintiff had some depression because he had not been employed for some time, but this did not constitute a disabling condition or one which would provide a need for further limitations in Plaintiff's mental RFC. While Dr. Abad-Santos found a greater level of functional limitations,

including some marked limitations, as the ALJ and Dr. Patterson noted, these conclusions lacked any clinical support and were extreme in view of the fact that Plaintiff was not receiving any treatment whatsoever for these conditions. (AR 28, 518.)

Finally, because the functional restrictions assessed by Dr. Abad-Santos were so extreme and out of line with the other objective evidence in the record, any error committed by the ALJ in failing to further assess or evaluate these limitations must also be considered harmless error.

For the foregoing reasons, the Court determines that Plaintiff's first issue does not have merit.

## II

**THE ALJ DID NOT PROPERLY DETERMINE THAT PLAINTIFF COULD PERFORM OTHER WORK AT STEP FIVE OF THE SEQUENTIAL EVALUATION PROCESS**

At Step Four of the Sequential Evaluation, the ALJ determined that Plaintiff could not perform any of his past relevant work as a production labor/general assistant; cable installer; construction worker; and field worker. This was consistent with the testimony at the hearing provided by the Vocational Expert ("VE"). (AR 31-32, 61-65.)

The ALJ determined, however, that, based upon the VE's testimony, Plaintiff would be able to perform the requirements of representative light SVP2 occupations such as assembler and janitorial worker. (AR 32.)

Plaintiff asserts that the ALJ's determination was erroneous because the alternative jobs identified at Step Five require a Language Level 1, which in turn requires a passive vocabulary of

10

recognizing the meaning of 2,500 words, printing simple sentences, and speaking simple sentences. (See DOT codes 712.687-010, 323.687-014.) Thus, the Court must examine whether the ALJ properly found alternative jobs at Step Five, and whether literacy or illiteracy was correctly evaluated.

The ALJ specifically found that Plaintiff has a limited education and is able to communicate in English. (AR 32, citing 20 CFR §§ 404.1564 and 416.964.)

20 CFR § 404.1564(b)(I) defines illiteracy as "The inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling."

At the hearing before the ALJ, Plaintiff was assisted by a sworn interpreter. (AR 50.) At the outset of the hearing, the ALJ asked Plaintiff a couple of questions regarding his mastery of English. These were the following:

"ALJ:    Do you speak any English?
CLMT:   I understand some.
ALJ:    Have you understood anything we've said so far?
CLMT:   Yes.
ALJ:    Can you speak English?
CLMT:   Very little."

(AR 51.)

In this litigation, the Commissioner cites this testimony as supportive of the ALJ's conclusion that Plaintiff is not illiterate within the meaning of the definition cited in the above regulation.

11

(JS at 21.) But this is far from persuasive, in part because at the time of his testimony, Plaintiff was being assisted by the sworn interpreter, and it is reasonable to therefore assume that the questions posed by the ALJ about Plaintiff's ability to speak and understand English were first translated into Spanish, and that the answers were provided by Plaintiff through the interpreter.

The Commissioner also notes that during the course of the hearing, Plaintiff indicated he recently became a United States citizen, that he has a driver's license, and that he drove his children to school each day. (JS at 21.) Nothing cited to the Court indicates that English literacy is required to become a United States citizen or to obtain a driver's license, or to drive one's children to school. Finally, the Commissioner notes that Plaintiff testified he has eight grades of schooling, which is argued as supportive of the ALJ's finding that Plaintiff is not illiterate. (See JS at 18, AR at 53.) But again, this is not a supportable inference, in that Plaintiff testified that he was born in Mexico in October 1968 and came to California in 1986 when he was approximately 18 years old. (AR 131, 486.) A reasonable inference might be that Plaintiff received schooling in grades one through eight in Mexico, when he was a minor. Clearly this would not contribute to a conclusion that Plaintiff was educated in English during his eight years of schooling. Consequently, for all of these reasons, there does not appear to be substantial evidence in the record from which the ALJ drew a conclusion that Plaintiff is able to communicate in English sufficient to make him not illiterate.

As Plaintiff's counsel argues, the jobs identified by the VE require a Language Level 1, which requires a passive vocabulary of

recognizing the meaning of 2,500 words, printing simple sentences, and speaking simple sentences. Plaintiff indicated that he does not know how to read or write English more than his own name. (See AR at 169.) Further, not only was he provided with a Spanish interpreter at the hearing, but he also was assisted by an interpreter at the internal medicine and psychiatric consultative examinations. (AR 491, 485.) It appears that at other medical appointments he also communicated through an interpreter. (AR 414.) None of this evidence contributes to a reasonable conclusion that Plaintiff had a sufficiently developed vocabulary that he could perform work requiring Language Level 1 requirements.

The Commissioner's argument in response is that Plaintiff's past relevant work required Language Level 1 or 2, under DOT requirements. (See JS at 22-23.) Again, this fails to persuade, because it does not address DOT requirements for work as it is normally or usually performed.

In Singmuongthong v. Astrue, 210 WL 3715152 (E.D. Cal. 2010), the issue of literacy was at the forefront of the decision, with regard to whether an ALJ properly found that a claimant could perform her past relevant work. In that case, the plaintiff's past relevant work as it is usually performed required a Language Level of 2. The Magistrate Judge, following the lead of the Ninth Circuit in Pinto v. Massanari, 249 F.3d 840, 847 n.5 (9th Cir. 2001), found that the ALJ had failed to elicit from the VE testimony that would explain the discrepancy between Plaintiff's language limitations and the DOT requirements of her past relevant work. (See 210 WL 3715152 at *7, citing Massachi v. Astrue, 486 F.3d 1149, 1153 (9th Cir. 2007)(citing SSR 00-4p).) Consequently, the Magistrate Judge found that the VE's failure to

13

explain the effect of plaintiff's language limitations or English communication skills on her ability to perform her past relevant work constituted error, in that there was no accounting for the deviation from the Language Level 2 requirement of the past relevant work that the plaintiff had performed.

Similarly, in this case, the hypothetical questions posed by the ALJ to the VE simply postulated an individual with "eight grades of education." (AR 61.) It is therefore uncertain if the ALJ, utilizing this factor in the hypothetical, led to the VE's implicit conclusion that a person with eight grades of education would not be illiterate. Nothing in the hypothetical indicated to the VE that the eight grades of education may have occurred in the person's native country (Mexico), and had been given in the person's native language (Spanish).

Based on this error, the matter must be remanded for a de novo hearing.

**III**

**PLAINTIFF'S CREDIBILITY AS TO HIS SUBJECTIVE SYMPTOMS**

**WILL BE REEVALUATED DE NOVO ON REMAND**

As a third issue, Plaintiff asserts that the ALJ failed to provide clear and convincing reasons to reject his subjective testimony. At the hearing before the ALJ, Plaintiff testified that he was depressed, has crying spells, and on some occasions has considered suicide; that he spends most of his time at home, sometime watching TV; that he does not read; that he on occasion does some house cleaning; that he does not cook; and does almost no socializing. (AR 56-57.)

14

The ALJ found that this testimony was not credible because, in part, it was inconsistent with what Plaintiff had indicated to the psychological consultive examiner. (AR 31.) But a review of those reports does not support the ALJ's conclusion that there was such a level of inconsistency as to depreciate Plaintiff's credibility. Thus, in the first report relied upon by the ALJ, prepared by Dr. Chang on January 4, 2010 (AR 423-433), under Activities of Daily Living, Dr. Chang found moderate impairment, noting that, "The patient is able to provide most of his self care, to take care of most of his personal hygiene, communicating, traveling and moving about, and doing some household chores." (AR 428.)

As to his social functioning, Dr. Chang reported that Plaintiff had some difficulties interacting appropriately with the general public, and while he gets along well with his immediate family members, his ability to communicate effectively is moderately impaired by insecurities, and he remains socially withdrawn, based on greatly diminished self esteem and depressed mood. He has difficulties interacting with strangers. (AR 429.) Dr. Chang also reported that Plaintiff's ability to sustain focus is very limited. (Id.)

In the later report referenced by the ALJ in the credibility section of the decision, Dr. Abad-Santos described Plaintiff's activities of daily living as follows:

> "The claimant currently lives with wife and children.
> The claimant cannot take care of self-dressing and self-bathing without help, but can take care of personal hygiene.
> For transportation, the claimant rides with wife or drives car when he is not in severe pain.
> Outside activities are walking as per advice of his

1       physicians.
2       The claimant is able to pay bills and can handle cash
3       appropriately.
4       The claimant is unable to go out alone without his wife.
5       The claimant's relationships with family and friends are
6       good.
7       The claimant can focus attention.
8       The claimant has difficulty completing household tasks due
9       to severe back and knee pain.
10      The claimant has difficulty making his decisions.
11      On a daily basis, the claimant drives young children to
12      school and watches TV."
13 (AR 492-493.)

15     The Court does not perceive that these psychological reports
16 contain substantial or material differences from Plaintiff's own
17 reporting of symptoms or his activities of daily living.
18      As to physical impairments, the ALJ relied upon his observation
19 that treating physicians had responded with limited and conservative
20 treatment. (AR 31.) As Plaintiff's counsel correctly notes, there is
21 evidence in the record that Plaintiff has been prescribed narcotic
22 pain medications, such as Vicodin, since his knee surgery. (AR 233,
23 259, 306, 383.) It would be difficult to fault Plaintiff for overly
24 conservative treatment when he has been prescribed strong narcotic
25 pain medications.
26      For the foregoing reasons, on remand, Plaintiff's credibility as
27 to subjective symptoms will be evaluated de novo.
28 //

This matter will be remanded for further hearing consistent with this Memorandum Opinion.

**IT IS SO ORDERED.**

DATED: July 18, 2014              /s/
                          VICTOR B. KENTON
                          UNITED STATES MAGISTRATE JUDGE